# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

TYRONE WESLEY POWELL,

      Defendant-Appellant.

UNPUBLISHED
June 25, 2015

No. 318863
Wayne Circuit Court
LC No. 13-003116-FH

Before: RONAYNE KRAUSE, P.J., and K. F. KELLY and SHAPIRO, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions of two counts of possession of a firearm by a person convicted of a felony (felon-in-possession), MCL 750.224f(1), and one count of possession of a firearm at the time of the commission of a felony (felony-firearm), MCL 750.227b(1). Defendant was sentenced to two years to 90 months in prison for one count of felon-in-possession, five years' probation for the second count, and two years in prison for felony-firearm. Because the trial court erred in denying defendant's motion for a new trial on the grounds of the ineffective assistance of his trial counsel, we reverse.

The basis of the charges was the police discovery of a pistol and a rifle in defendant's home. The police, for reasons discussed later, had obtained a search warrant for the house. When shown the warrant, defendant allowed the officers to enter the home. The officers secured the area and found defendant, his elderly father, the mother of defendant's child, and a few small children present.

Several police officers gave testimony at trial. Officer Matthew Fulgenzi testified that he spoke with defendant, who told him that he lived in the second-floor southeast bedroom and identified a second bedroom as his father's, a third bedroom (which was never searched by the police), and a fourth bedroom that had been converted into a storage room. Another officer, Bradley Clark, testified that he asked defendant if he had any guns in the house, to which defendant replied that there was a rifle in the upstairs bedroom, leaned against the wall behind the door.

Officer Travis Kostanko testified that he was the first officer to enter what he identified as defendant's bedroom. He stated that the door had a lock on it, but that it was not locked. Fulgenzi stated that the bedroom appeared to be actively used and contained clothes, some of which appeared to be defendant's size. Fulgenzi also found a letter addressed to defendant

-1-

postmarked October 22, 2012 and a traffic ticket in defendant's name dated September 17, 2012. Fulgenzi testified that he also found a nickel-plated revolver and a magazine for an assault rifle on top of a dresser in the bedroom. The magazine was for a .232 rifle that Kostanko found leaning against the wall behind the bedroom door. The two officers discovered a second handgun, a .40 caliber "Springfield XP," underneath the bed. According to the officers, when confronted with the firearms, defendant admitted that the items belonged to him. Clark also stated that, when he had difficulty unloading the nickel-plated revolver, defendant demonstrated the process necessary to accomplish the task.

The prosecution also presented testimony from Jacqueline Barnes, who lived eight houses north of defendant. According to the police, the search warrant had been obtained based upon Barnes's allegations regarding defendant's use of a firearm several weeks prior to the search. However, defendant was *not* charged with any crimes arising out of incidents with Barnes. It appears that the relevancy of Barnes's testimony was that the gun she described having seen him brandish was of the same appearance as the pistol found in the house during the search. In other words, the purpose of the testimony was to link defendant to the gun in question.

Barnes testified that, in late January 2013, she was walking her leashed pit bull down the street she shared with defendant. She stated that she slipped and the dog ran free, eventually toward defendant's house. Barnes testified that defendant, his daughter, and "some other guy" were on defendant's porch at the time. According to Barnes, as she attempted to catch her dog near the porch, defendant said something to her regarding not having a loose pit bull in the neighborhood around his daughter. Barnes stated that, as she bent down to try to grab the leash, she heard a gunshot, and when she looked up, saw defendant holding a silver gun with a black handle. She claimed that defendant then threatened to shoot the dog if it came near his house again. Barnes did not report this incident to the police.

Barnes further testified that on the evening of February 7, 2013, she was taking her garbage cans to the curb when her dog escaped her yard and ran down the street. Barnes stated that the dog ran toward defendant's home. Defendant happened to be pulling into his driveway at the same time. Barnes testified that, as she was chasing after the dog, defendant got out of his truck and said, "Didn't I tell you if I saw that dog down here again I was going to shoot her?" The following morning, Barnes went to a Detroit police station and filed a report against defendant. Approximately one week later, the police contacted Barnes. She described defendant's physical features, gave his address, and identified him in a photographic lineup. On this basis, police obtained the search warrant for defendant's home.

Following the close of the prosecution's case in chief, defense counsel informed the trial court that he was going to call three witnesses in addition to defendant. The prosecution objected on the grounds that defendant had not filed a witness list which, by the terms of the scheduling order, had been due almost five months earlier. Defense counsel responded that he had "texted" the names to the prosecutor a week before trial and was under the impression that the prosecution would not object to their testimony. He also stated that the witnesses were all present in the hallway outside the courtroom and prepared to offer exculpatory testimony. The prosecutor reiterated his objection, stated that he had never agreed to waive the objection and that the text from defense counsel was not only grossly late, but also contained only the names of the witnesses, not their addresses or phone numbers as required by the scheduling order.

The trial court sustained the objection and so the only witness to testify for the defense was defendant himself. He testified that he owned the subject home and lived there with his daughter, father, and sister, Betty Nance. He stated that Nance had moved in approximately two years earlier to escape an abusive boyfriend and that he helped Nance move many of her belongings into the home, but as far as he knew, she did not bring any weapons. At approximately the same time, defendant's father moved into the home, as he was suffering from Alzheimer's disease and needed additional care. Defendant testified that because of his dementia, his father began roaming the house at night and frequently took items belonging to Nance and defendant, including keys, money, and cellular phones. Because of this behavior, defendant installed locks on most of the rooms of the house as well as on the interior entry doors in order to keep his father from roaming the streets at night. Defendant stated that the southeast bedroom, where the guns were found, had one of these locks and that only Nance possessed a key, because she had used to room to store items she had brought from her ex-boyfriend's home. Defendant testified that he had not had access to the room for at least a year prior to the execution of the search warrant. He testified that the several-month-old letter and traffic ticket must have been left in the room by one of the other residents. Defendant further testified that he always slept in the living room to make sure his father did not leave the house and denied telling the officers that he lived in the southeast bedroom, possessed a rifle, or demonstrated how to unload one of the recovered guns. In sum, defendant testified that he did not live in the room where the guns were found, did not know guns were in the room, and that the room was generally kept locked by his sister.

In rebuttal, the prosecution recalled Fulgenzi, who testified that he had been to defendant's home four years prior, i.e., in 2009, and that at that time defendant was living in the southeast bedroom.

Defendant was convicted on all counts. Defendant appealed, in part arguing that he had been deprived of the effective assistance of counsel due to his trial attorney's failure to timely file a witness list. In support of this argument, defendant attached affidavits from the three individuals whose names he claimed to have provided to his trial attorney prior to the deadline for filing proposed witness lists and whose names were those provided in defense counsel's tardy text to the prosecutor. In conjunction with his appeal, defendant filed a motion to remand for a *Ginther*[1] hearing on his claim of ineffective assistance of counsel. We granted the motion and retained jurisdiction.[2]

At the *Ginther* hearing, the three witnesses in question, Nance, Angel Wood, and Eric Ligon, testified.

Ligon's testimony concerned the January incident with Barnes and the dog. He testified that he was the third person present on the porch during the incident. He agreed that defendant

---

[1] *People v Ginther*, 390 Mich 436, 443; 212 NW2d 922 (1973).

[2] *People v Powell*, unpublished order of the Court of Appeals, entered September 24, 2014 (Docket No. 318863).

had argued with Barnes, but testified that defendant did not display or fire a weapon and did not threaten violence toward Barnes's dog.

Nance testified that she had lived in defendant's home for approximately two years and corroborated defendant's descriptions of his father's medical conditions. She stated that she was visiting family in Georgia and so was not present when the search warrant was executed. She testified that during the two years since she moved in, defendant slept on the living room couch and not in the southeast bedroom. She further testified that all of the guns and ammunition found in the home belonged to her ex-boyfriend and had been locked in the southeast bedroom. She stated that she had the only key to this lock and that she kept it at the top of the hallway closet. She stated that she had never seen defendant remove any of the weapons from the bedroom. In her affidavit she stated that "if [defendant] ever needed anything out of there he would just get the key from me which wasn't very often at all, lock the door back and give me the key back." On cross-examination, she was asked "how would Mr. Powell, get in there, if he was to get in there?" and she answered "He asked me where it was and I'd tell him."

Wood also testified that defendant did not live in an upstairs bedroom but slept on the living room couch. She stated that she was in the home when the search warrant was executed and police spoke with defendant. She testified that she was "[t]wo feet away" from the discussion between police and defendant and, when asked whether she remembered a discussion about "[a]ny gun[,]" she replied, "I don't recall anything."

At the *Ginther* hearing, defendant testified that he had informed his trial counsel well in advance of trial that the guns belonged to Nance's ex-boyfriend and gave him the relevant information regarding Ligon, Nance, and Wood in order to have them serve as potential witnesses. Defendant's trial counsel also testified and admitted that defendant had given him the names and relevant information regarding Ligon, Nance and Wood well in advance of trial, but that he had failed to file a witness list.

At the conclusion of the *Ginther* hearing, defendant moved for a new trial on the basis of the ineffective assistance of counsel. The court ruled (and the prosecution agreed) that trial counsel's performance was deficient, but denied the motion based on its conclusion that the failure to call the three witnesses did not affect the outcome of the trial. In its opinion, the court wrote:

> The main issue, therefore, is had those witnesses been permitted to be called by the defense, would the outcome have been any different? This Court finds that in that regard, the outcome *would not necessarily have been any different than what it ultimately was*. Why? Because the police officers testified that upon their search of the defendant's residence, they found a handgun, as well as a rifle, and the defendant had admitted that the rifle upstairs was his and that it was in his bedroom.
>
> The main test is whether or not the brandishing of a handgun was exercised by the defendant, as was contended by the prosecution's main complaining witness, Ms. Barns [sic]. It was only that complaint which was used to establish the probable cause for the searching of defendant's residence.

The defendant's previous convictions precluded him from possessing a firearm. Therefore, the finding by the jury that the defendant was guilty of two counts of Felon in Possession of a Firearm, as well as Felony Firearm, were clearly established during the course of the trial, and the testimony of Betty Nance, Angel Wood and Eric Ligon would not have made any difference. [Emphasis added.]

The right to the effective assistance of counsel is guaranteed by the United States and Michigan constitutions.[3] "To prove a claim of ineffective assistance of counsel, a defendant must establish that counsel's performance fell below objective standards of reasonableness and that, but for counsel's error, there is a reasonable probability that the result of the proceedings would have been different." *Swain*, 288 Mich App at 643. "Whether a person has been denied effective assistance of counsel is a mixed question of fact and constitutional law." *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). The trial court's findings of fact are reviewed for clear error and the questions of constitutional law are reviewed de novo. *Id.*

The parties agree that trial counsel's conduct in failing to file a witness list before trial in accordance with the trial court's scheduling order fell below an objective standard of reasonableness. Further, at the *Ginther* hearing, counsel admitted that he was aware of the witnesses defendant wished to call well before trial and did not timely file a witness list because he thought he could wait until seven days before the beginning of trial, despite the trial court's order establishing a deadline for witness lists. Because trial counsel was aware of defendant's possibly exculpatory witnesses well before trial and failed to properly file a witness list with the trial court or timely provide the names of potential witnesses to the prosecution, his conduct was inexcusable neglect that fell below the professional norm. See *People v Pickens*, 446 Mich 298, 327; 521 NW2d 797 (1994) (holding that trial counsel's conduct in failing to file notice of an alibi defense despite knowing of the possible testimony well before trial was conduct that fell below an objective standard of reasonableness).

Defendant therefore satisfied the first prong of the test for ineffective assistance of counsel. The second prong that must be shown is that "but for counsel's error, there is a *reasonable probability* that the result of the proceedings would have been different." *Swain*, 288 Mich App at 643 (emphasis added). The trial court's opinion makes clear that it misunderstood this prong. In articulating the test, the trial court stated that reversal is only proper if the defense shows that the outcome would *necessarily* have been different. The question is not, however, whether defendant can show that the outcome would certainly have been different, as the court seemed to believe, but whether defendant had shown a *reasonable probability* that the outcome would have been different.[4]

---

[3] US Const Am VI; Const 1963, art 1, § 20; *United States v Cronic*, 466 US 648, 654; 104 S Ct 2039, 80 L Ed 2d 657 (1984); *People v Swain*, 288 Mich App 609, 643; 794 NW2d 92 (2010).

[4] Apparently foreseeing its post-trial ruling, when, at trial, defendant's attorney conceded that failing to file the witness list was his, not defendant's, error, the court responded that, "Falling on your sword will do no one any good" and "It doesn't do any good to have a *Ginther* hearing either."

Viewing the test in its proper light, we conclude that but for trial counsel's error, there is a reasonable probability that the outcome of defendant's trial would have been different.

The police did not find defendant in the actual possession of a firearm and defendant was not charged with a crime in relation to his interactions with Barnes. Thus, the prosecution was required to prove that defendant constructively possessed the firearms found in his home.[5] See *People v Minch*, 493 Mich 87, 91; 825 NW2d 560 (2012).

> The test for constructive possession is whether the totality of the circumstances indicates a sufficient nexus between defendant and the contraband. Although not in actual possession, a person has constructive possession if he knowingly has the power and the intention at a given time to exercise dominion or control over a thing, either directly or through another person or persons. [*Id*. at 91-92 (quotation marks omitted).]

"[A] person has constructive possession if there is proximity to the article together with indicia of control. Put another way, a defendant has constructive possession of a firearm if the location of the weapon is known and it is reasonably accessible to the defendant." *People v Johnson*, 293 Mich App 79, 83; 808 NW2d 815 (2011), quoting *People v Hill*, 433 Mich 464; 446 NW2d 140 (1989).

In this case, the determination of constructive possession largely rested on the weight and credibility of witness testimony. Nance's testimony fully supported defendant's contention the guns were not his and that he did not know that the guns were there. Nance stated that only she had access to that bedroom and had hidden the only key to the lock. This was consistent with defendant's assertion that he did not live in the southeast bedroom and did not have access to it. While Nance admitted that she would have given defendant the key had he asked, she also testified that she had no knowledge of him ever asking for the key or entering the room since she lived there, or at least since she had stored the guns there. Nance also testified that she moved into the home and stored her belongings there only two years previous to the execution of the search warrant, undercutting the significance of Fulgenzi's testimony that defendant had resided

---

[5] Defendant was also convicted of felony-firearm, MCL 750.227b(1), which provides in pertinent part:

> A person who carries or has in his or her possession a firearm when he or she commits or attempts to commit a felony . . . is guilty of a felony, and shall be imprisoned for 2 years.

In *People v Calloway*, 469 Mich 448, 452; 671 NW2d 733 (2003), our Supreme Court held that felon-in-possession may serve as the predicate felony for felony-firearm. Thus, if the jury found that defendant constructively possessed the firearms recovered in his home, it was required to convict him of felony-firearm. Therefore, defendant's felony-firearm conviction rests of the jury's finding that he constructively possessed the firearms and, accordingly, we need not separately address that conviction.

in the bedroom in 2009. Moreover, both Wood and Nance testified that defendant slept in the living room and did not live in the southeast bedroom.

Ligon's testimony, if believed, refuted Barnes's testimony that she saw defendant brandish and fire a pistol similar in appearance to the pistol found in the home by the police. Contrary to the trial court's rationale, it is irrelevant that defendant was not charged with brandishing a firearm, or any other crime, arising from the alleged encounter with Barnes. Ligon's testimony would have contradicted the only testimony actually placing a firearm in defendant's physical possession. Such testimony is unquestionably relevant to a jury's determination of whether a defendant constructively possessed a firearm found in his home.

The proffered testimony raises significant questions about whether a reasonable jury could have found that defendant exercised dominion and control over the recovered firearms. Indeed, it is possible that a rational jury could conclude that defendant did not even know the firearms were in the home. To be sure, a jury could certainly have rejected the proffered testimony and, based on the testimony of the officers and Barnes, convicted defendant of the charges. However, as noted, the question is not whether, but for counsel's error, the outcome of defendant's trial would *necessarily* have been different, but whether there is a *reasonable probability* of a different outcome. In this case, defense counsel's error prevented the jury from hearing the testimony of three witnesses who each directly contradicted the testimony of the key prosecution witnesses. Instead, they only heard defendant's testimony, which the prosecution reasonably argued was merely a self-serving denial that could not outweigh the testimony of three police officers. The trial court dismissed the possible impact of the three exculpatory witnesses because the police officers gave inculpatory testimony. However, determinations of witness credibility and the weight given to the evidence are reserved for the jury. See *People v Unger*, 278 Mich App 210, 222; 749 NW2d 272 (2008).

The trial court erred in denying defendant's motion for a new trial on the basis of ineffective assistance of counsel. Reversed and remanded for new trial. We do not retain jurisdiction.

/s/ Amy Ronayne Krause
/s/ Kirsten Frank Kelly
/s/ Douglas B. Shapiro